## IN THE COURT OF APPEALS OF IOWA

No. 18-1652
Filed February 6, 2019

IN THE INTEREST OF R.W. and D.F.,
Minor Children,

M.J., Mother,
        Appellant.

_____

        Appeal from the Iowa District Court for Pottawattamie County, Charles D.

Fagan, District Associate Judge.

        The mother appeals the termination of her parental rights to her children.

**AFFIRMED.**

        Kyle J. McGinn of McGinn, Springer & Noethe, P.L.C., Council Bluffs, for

appellant mother.

        Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney

General, for appellee State.

        Roberta Megel of State Public Defender's Office, Council Bluffs, guardian

ad litem for minor children.

        Considered by Potterfield, P.J., and Doyle and Bower, JJ.

**POTTERFIELD, Presiding Judge.**

The mother appeals the termination of her parental rights to her children, D.F., born in 2012, and R.W., born in 2017.[1] The mother's parental rights were terminated pursuant to Iowa Code section 232.116(1)(d), (e), (f),[2] (h),[3] (i), and (*l*) (2018). On appeal, the mother challenges the statutory grounds for termination and argues a permissive factor weighs against terminating her parental rights.

We review the juvenile court's decision to terminate parental rights de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). "Grounds for termination must be proven by clear and convincing evidence." *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006).

We begin by considering the statutory grounds. "When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record." *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012). Paragraphs (f) and (h) include similar elements but apply to children of different ages. *Compare* Iowa Code § 232.116(1)(f), *with id.* § 232.116(1)(h). Paragraph (f) applies to children who are age four or older, have been adjudicated a child in a need of assistance (CINA), and have been out of the home the required time. *Id.* § 232.116(1)(f)(1)–(3). Paragraph (h) applies to children three and under who have been adjudicated CINA and out of the home the required time. *Id.* § 232.116(1)(h) (1)–(3). The mother does not contest these elements as they apply to D.F. and R.W., respectively. However, she challenges

---

[1] The parental rights of the unknown biological fathers and D.F.'s legal father were also terminated. No father appeals.
[2] As to D.F. only.
[3] As to R.W. only.

the fourth element of both subsections—whether the children could be returned to her care at the time of the termination hearing. *See id.* § 232.116(1)(f)(4), (h)(4); *see also In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting "at the present time" in the statutory language to mean "at the time of the termination hearing").

The mother argues the children could have been returned to her care at the time of the termination hearing. She faults the department of human services (DHS) for not conducting a home study on the shelter at which she was living before the termination hearing. We acknowledge the testimony that a home study would need to be—and was not—conducted, but this alone is not what prevented the children from returning to their mother's care.

D.F. was originally removed from the mother's care in July 2016 due to concerns about domestic violence being perpetrated against the mother in front of D.F. and the mother's serious mental-health concerns, including untreated anxiety and bipolar disorder.[4] There were also reports the mother was smoking marijuana while caring for D.F. (and pregnant with R.W.).

R.W. was born in late May 2017 and was removed from the mother's care on June 1 due to issues of domestic violence between the mother and a different romantic partner. The mother reported the man shook her, slapped her, and bit her on the neck while she was holding R.W.; D.F., who was also present,[5] tried to stop the man and was pushed into a folding chair. The man had been arrested a month before for perpetrating domestic violence against the mother.

---

[4] The mother had previously been involved with services through the state of Nebraska before moving to Iowa.

[5] At the time, the mother was having semi-supervised visits with D.F. and R.W. remained in her care.

The mother was able to make a number of positive changes, and both R.W. and D.F. were returned to her custody in January 2018. However, they were removed again approximately thirty-five days later for a number of reasons. First, DHS received a report the mother was using methamphetamine and leaving R.W.—still an infant—home alone. The mother eventually completed a hair-stat test, which returned a positive result for methamphetamine. It was reported by D.F.'s school that he missed six days of class during the time period he was in his mother's care, with only a couple of absences being considered excused. Additionally, R.W. suffered from two abscesses during the time period, which may have been prevented if the mother had not failed to pick up and administer medication R.W. was prescribed.

After the children were removed at the end of February 2018, the mother completed a substance-abuse evaluation, which recommended she attend inpatient substance-abuse treatment. She did not do so. Additionally, although it was a recommendation throughout the pendency of the cases, the mother never completed a class on domestic violence. From the end of February until the termination hearing—in late August 2018—the mother resided in a number of places. She spent approximately three weeks in shelter before being hospitalized and placed in a psychiatric ward for a number of weeks for mental-health treatment. She was then discharged to what the mother referred to as a mental-health respite, where she remained until July 25. The mother then moved into a shelter for women and children fleeing domestic violence; she remained there at the time of the termination hearing. It is for this final place, where she had been

staying for approximately one month, the mother claims DHS should have conducted a home study.

Although the mother testified that she is not using drugs and the positive hair-stat test was not a result of her personal use of methamphetamine, we are not convinced of the mother's sobriety. She testified she has had many negative drug tests since the positive test in February 2018, but the mother did not provide any results from the shelter—where she states she is being tested—and has failed to complete most of the testing through DHS. Her testimony explaining her failure to comply with DHS testing is inconsistent, at best. The mother originally denied knowing she was supposed to be testing through DHS—claiming nobody had asked her to do so lately. However, when it was pointed out that a person came to her home and asked her to test, she acknowledged that was true and claimed she must not have been home at the times the person came. Reports from DHS show there were seven times the tester attempted to reach the mother, where they "knocked, [and got] no answer." However, she answered the door and refused to test in April 2018, reporting she did not have time; tested negative for all substances in May; and then did not test when asked in August, claiming she was unable to provide a urine sample.

The mother's testimony about substance-abuse treatment was also inconsistent. She first testified that when she completed her substance-abuse evaluation, she was told to "only do mental health" but then the evaluator changed their mind, saying the mother had "to do drug treatment because [she] was pregnant. She said that's the only reason why she recommended it." The mother testified she called for residential treatment but was told they would not take her

because she "didn't have any dirty UAs." Later, when she was again asked about substance-abuse treatment, the mother testified, "No, because they didn't want to take me because I didn't have any dirty UAs. And, apparently, nobody has asked me to do a UA for I don't know how long." Yet, when asked, the mother testified she had been honest with the treatment provider about her February test that was positive for methamphetamine. The mother claimed she had not completed any other type of substance-abuse treatment because "nobody told [her] to," maintaining "[she] asked what [she] was supposed to do [but she] ha[d]n't heard from [the social worker] in months." However, at another point, the mother testified that when she was denied residential treatment, she was instructed "to go to treatment classes," which she did not do because she "had already moved back to Omaha."

The mother did not recommit to services after her children were removed from her care for a second time. Because of her lack of involvement, there is little in the record to support the mother's assertions she is sober and stable in her mental health. The inconsistent nature of her testimony did little to convince us of the credibility of her claims. For these reasons, we agree with the juvenile court's conclusion the children could not be returned to their mother's care at the time of the termination hearing, as children cannot be returned to their parent's care if doing so would cause the children to be exposed to any harm resulting in a new CINA adjudication. *See In re M.S.*, 889 N.W.2d 675, 680 (Iowa Ct. App. 2016).

Next, the mother conflates the best-interests argument, *see* Iowa Code § 232.116(2), and the permissive-factors argument, *see id.* § 232.116(3). She maintains, "The juvenile court erred in holding that there is not clear and convincing

evidence to show that the termination of the parent-child relationship would be detrimental to R.W. and D.F. and not in their best interest due to the strength of their bond with their mother." The mother has the burden to prove an exception to termination applies. *See In re A.S.,* 906 N.W.2d 467, 476 (Iowa 2018) ("[O]nce the State has proven a ground for termination, the parent resisting termination bears the burden to establish an exception to termination under Iowa Code section 232.116(3)[]."). In support of her claim, the mother relies upon "multiple" reports from DHS that state "D.F. clearly has a strong bond with his mother." But claiming there is a strong bond between the oldest child and his mother is not sufficient to establish that termination would be detrimental to D.F. *See* Iowa Code § 232.116(3)(c); *see also D.W.*, 791 N.W.2d at 709 (recognizing that while the parent loves their child, "our consideration must center on whether the child will be disadvantaged by the termination, and whether the disadvantage overcomes [the parent's] inability to provide for [the child's] developing needs"). Moreover, as the mother recognized at trial, she has spent little time in a maternal role to R.W.

Under these circumstances, no permissive factor weighs against the termination of the mother's parental rights. We affirm.

**AFFIRMED.**